ALVIN T. WALSH, and others, *vs.* ANDREW C. WHEELWRIGHT.

Hancock. Opinion February 24, 1902.

*Will. Adverse Possession. Evidence. Declarations. Deed.*

1. In a real action by the heirs of one who died seised, evidence that a will was left by the deceased without any evidence of its contents does not defeat the action.

2. When a party, to prove title by adverse possession, introduces evidence of occupation by one whom he had placed in possession as a purchaser under oral contract and who had in fact paid for the land, but was deceased before obtaining a deed, the declarations of such deceased occupant made on or near the land during his occupation to the effect that such occupation was not adverse to the owner by record, are admissible evidence upon the issue whether the possession was adverse.

3. The rule that actual adverse occupation of part of a tract of land under a recorded deed is a constructive adverse occupation of the whole tract covered by the deed, does not apply to a record owner none of whose land is thus occupied. Unless some part of his own land is adversely occupied, the record owner is not affected by the fact that his land is included with other land in a deed between strangers followed by an adverse occupation of some part of the other land not his. The case *Noyes* v. *Dyer*, 25 Maine, 468, is overruled so far as it conflicts with this decision.

Exceptions by defendant. Overruled.

Writ of entry for the recovery of a parcel of land in Northeast Harbor on Mt. Desert Island, described as follows:—

"Beginning at a large rock marked with a cross near the county road below house formerly of William Roberts; thence running west seventeen degrees south eleven rods; thence south a little eastwardly to a fir tree on the beach at the mouth of Northeast Harbor; thence eastwardly by the shore to a fir tree near the county road, spotted on four sides; thence northerly to the first mentioned bound, containing one acre more or less, together with all the privileges to the same."

Defendant plead the general issue. The verdict was for plaintiffs and the defendant alleged the following bill of exceptions:—

The said one acre was part of lot No. 69, according to the Peters plan of Mt. Desert, containing one hundred acres, more or less. It was admitted that Harriet Pung acquired title to the whole of lot No. 69, conveyed to her in description by metes and bounds under deed from the trustees of the Bingham estate, dated November 1, A. D. 1841, recorded November 2, A. D. 1841, in the registry of deeds for Hancock county, Maine, in Vol. 70, page 515.

The plaintiffs, or demandants, claimed title to said one acre as heirs at law of Edward Walsh, and under deed from Harriet Pung to Edward Walsh of her right, title and interest in and unto the lot described as in the declaration. Deed dated May 2, A. D. 1842, recorded May 4, A. D. 1842, in said registry, in Vol. 272, page 268.

The tenant, or defendant, claimed title by adverse possession or prescription (by himself and his predecessors) and through occupation with color of title under the following deeds:

(1)  Quit-claim deed, Harriet Dodge (the Harriet Pung above mentioned) and her husband, Gideon Dodge, to James Bartlett, Jr., dated October 23, A. D. 1844, recorded January 6, A. D. 1845, in said registry, in Vol. 75, page 396.

(2)  Mortgage, said James Bartlett to Samuel Langly, Franklin Greene and Henry Ward Greene, copartners as Langly, Greene & Company, dated October 14, A. D. 1847, recorded November 1, A. D. 1847, in said registry, in Vol. 82, page 355.

(3)  Assignment of said mortgage by said mortgagees to Cornelius Wasgatt, dated March 26, A. D. 1851, recorded April 1, A. D. 1851, in said registry, in Vol. 89, page 478.

(4) Foreclosure of said mortgage by said Cornelius Wasgatt, by publication; notice dated April 1, A. D. 1851, last publication being April 22, A. D. 1851. Notice recorded in said registry, April 29, A. D. 1851, in Vol. 90, page 329.

(5) Quit-claim deed, said Cornelius Wasgatt to Joseph H. Curtis and John T. R. Freeman, dated December 2, A. D. 1880, recorded December 15, A. D. 1880, in said registry, in Vol. 176, page 18.

These instruments introduced by the defendant covered all of lot 69 in description by metes and bounds.

(6) Warranty deed, said Joseph H. Curtis and said John T. R. Freeman to Andrew C. Wheelwright, the defendant, dated September 17, A. D. 1881, recorded October 1, A. D. 1881, in said registry, in Vol. 179, page 215.

This deed contained in description by metes and bounds twenty-five acres, more or less, and included the one acre specified in the declaration.

(7) Quit-claim deed, said Joseph H. Curtis and John T. R. Freeman, to Andrew C. Wheelwright dated December 12, A. D. 1881, recorded December 16, A. D. 1881, in said registry, in Vol. 179, page 498.

This last named deed was confirmatory of the previous warranty deed between the same parties, and evidently given after permanent monuments were placed at various points in the lines of the twenty-five acre lot.

The plaintiffs claimed as heirs at law of Edward Walsh, offered the testimony of Mr. Charles A. Walsh, the youngest son of said Edward Walsh, who testified in substance that said Edward Walsh died in 1890, and that the plaintiffs were the heirs at law of said Edward Walsh. Following this testimony, he also testified, on direct examination, relative to the will of said Edward Walsh, as follows:

Q. Did Edward Walsh leave any will that is probated in this State? A. He left a will.

Q. Is it probated in this State? A. That I could not say, I do not think so.

The court ruled, subject to seasonable exception of the defendant, as follows:

"It not appearing by any other evidence, or by this evidence, that the will of Edward Walsh has been probated in this state, I instruct you that these plaintiffs, they being, if they are, the heirs at law of Edward Walsh, may maintain this action so far as the question of his having left a will is concerned."

It appeared from the testimony that lot 69 was known as the "Pung lot" and also later as the "Wasgatt lot." Upon the lot, but not upon the one acre, were dwelling-house, barns, fish house, etc. A portion of the lot, but not including the pasture, was cultivated and used as a farm field. The acre in question appears to have been within the limits of that portion of lot 69 which the defendant and those under whom he claimed, occupied as a pasture, that portion of the lot used for farming purposes, and upon which the dwelling-house and out buildings and fish house were located, being enclosed with a fence, and the pasture adjacent thereto, and including the one acre, being also fenced. A fence separated the mowing-field from the pasture land. The testimony tended to show this sort of occupation down to the time that Cornelius Wasgatt sold to Curtis and Freeman in 1880. After Curtis and Freeman sold to Andrew C. Wheelwright the twenty-five acres in 1881, Mr. Wheelwright built thereon a summer cottage, and kept his lot, including the one acre, enclosed. His house, however, was not on the one acre in question.

Cornelius Wasgatt, under whom the defendant claimed, appears to have acquired his mortgage of the Pung lot, or Wasgatt lot, in 1851, and made conveyance in 1880, as above noted. During part of the time he appears to have claimed under the foregoing instruments, he placed his brother, Thomas Wasgatt, in charge of his property under an arrangement disclosed by the testimony of Cornelius Wasgatt, as follows:

### TESTIMONY OF CORNELIUS WASGATT.

Q. When did you first have any knowledge of the property, that has been spoken of in this suit as the Wasgatt farm or Wasgatt place, at Northeast Harbor? A. It was before 1852, but I couldn't tell

only as I heard the depositions here and saw the records; because I know I went away in the fall of 1852. I supposed it to be about 1850, but I see by the records it is 1851.

The COURT: You did foreclose, did you, Mr. Wasgatt?    A.    I foreclosed.

Mr. KING: Did you send anyone to take possession of the property?    A.    I did.

Q.    Who did you send?    A.    I sent Thomas.

Q.    Did you go and examine the property before you bought the mortgage?    A.    I didn't examine it all over.

Q.    Did you go there?    A.    I went there and looked at the place and bought with reference to the chances for business, and that fall I went home and learned that the property had been cared for by my brother.

Q.    You say you went home. What do you refer to as your home?    A.    That was Beech Hill, where my parents lived at that time.

Q.    Were you married at that time?    A.    No, sir.

Q.    How long did you remain at Beech Hill, at your father's, at that time?    A.    I only remained there a short time, for I remember that I went into the woods to work that winter. After the mills hung up I went home.

THE COURT: What is this, the year 1851, that you acquired the mortgage?    A.    Yes, sir.

MR. KING: In the spring, after returning from the woods, did you go back home?    A.    Yes.

Q.    Did you make any arrangement with your brother Thomas about the occupation of this property, and if so, what?    A.    We had a verbal agreement or understanding that he should eventually have one-half the property; and he always staid at home, he was really somewhat of an invalid, and staid at home, and the understanding was that he should occupy it and care for it; I was away both winters and summers.

Q.    Where did you go after that, Mr. Wasgatt?    A.    Well, the

next summer, 1852, I worked in the mills again for the same party, and that fall I went to California.

Q.   How long did you remain in California?   A.   I was there a trifle less than five years, but the five years had elapsed before I got home; about a month on the way.

.          .          .          .

Q.   I don't think it was quite clear what the arrangement was with your brother.   Do you mean your brother was to have half of the property by paying you for it?   A.   He was to have half the property by repaying me for half the property; and sometime subsequently the arrangement was that he should have the whole of it by paying for the whole of it.

Q.   When was that arrangement made, if you can tell?   A.   I can't tell when that arrangement was made; that was the understanding I know.

Q.   As a matter of fact, had he practically paid you at his death?

A.   He had, he had paid me and, well, in fact, before his death I offered to give him a deed, but he didn't care about taking a deed; that wasn't a great while before he died.

From other testimony in the case, it appeared that Thomas Wasgatt left the property in about 1867.   Thereafter, however, at different periods, he placed some other tenant in possession.

The legal title appeared never to have been in Thomas Wasgatt. Thomas Wasgatt was thus in possession under Cornelius.

The plaintiffs claimed that Thomas Wasgatt made certain admissions operating as against the title, or claim of title, on the part of Cornelius Wasgatt.   The testimony showing these admissions came from three witnesses, viz:  Augustus C. Savage, Albert L. Brown and Mrs. Deborah Sumner, and their testimony as to the admissions of Thomas Wasgatt were admitted, subject to seasonable objection on the part of the defendant.   Such admissions appeared in the testimony as follows:

Testimony of AUGUSTUS C. SAVAGE, called by the plaintiffs in rebuttal:

Q.   Do you remember having a conversation with Thomas Wasgatt at one time, standing down there by this rock?   A.   I do.

Q. State when it was that you had this conversation? A. That was between the first and middle of June, 1855.

Q. Did the conversation have reference to the acre of land? A. It did.

Q. Now, I will ask what the conversation was? A. We spoke. about the lot in a general way, and he and I went together and found the rock; I never had seen it before, and he said he never had seen the rock, but we spoke of it and walked along there, and trod down the underbrush, some alders; there had been an old fence there, some decayed pieces still remained, I remember.

Q. Was there any fence standing there at the time? A. No sir, not there.

THE COURT: What do you mean—along by the road? A. Along by the road.

MR. DEASY: Was there some remnants of an old fence there? A. There was.

Q. Where was this rock with reference to the remnants of the old fence? A. The old fence went directly over; there was other large rocks besides the marked one that had been rolled out in building the road; rolled out of the road.

Q. What else was said by him, anything said about a deed? A. Yes; he said there at that time that that rock corresponded with the record of a deed to Mr. Walsh that he had seen.

Q. What was the date of this again, the year? A. Well, it was in 1855.

Q. What time in the year? A. June.

Q. Were you quite familiar with Thomas Wasgatt? A. Yes, sir.

Q. Have you at other times and other places during Thomas Wasgatt's occupancy there, had conversations with him in relation to this lot, or spoken of it? A. Well, it has been spoken of in a general way between us, I couldn't fix the dates, as the Walsh lot, in locating different places.

TESTIMONY OF ALBERT L. BROWN.

Q. When was this? A. Well, I couldn't tell exactly, but it was shortly after I come out of the army.

Q.   When did you come home from the war?   A.   In 1866.

Q.   Where did you meet Thomas A. Wasgatt at this time, and have this conversation?   A.   I met him down by a big rock there, next to the road, right by the side of the road.

.      .      .      .

Q.   Was it near this rock that you were when you met Thomas A. Wasgatt soon after the war?   A.   Yes sir; Thomas Wasgatt sat down on this rock and I sat down on the side of the road, where we was when we was talking.

Q.   Did your conversation have reference to the lot of land by that rock?   A.   Part of the conversation did, yes sir.

Q.   State what the conversation was?   A.   Well, I asked him if he didn't think that he missed it in cultivating the back part, the other side of the lot, instead of that.   I told him that it looked to me as if that was a great deal more fertile piece of land and easier cultivated in every way, and I thought it would pay him better to have the field there than it would where he did.   Says he "I don't own this land nor never did;" says he "here is a piece of land laying here, between here and the beach and that line of stakes out there"—there was a line of stakes then sticking up that showed there had once been a fence, but the stakes, some of them leaning this way and some that way, and any way, but it seemed as though the bottoms of them come pretty near on a line, I should say, running from that rock over a distance, and he said that piece of land he didn't own nor never did.

Q.   Did he say who did own it?   A.   Well, he told who owned it, but I couldn't swear to the name, as I am hard to remember names; but there is one thing I do remember that he said, that he was a shoemaker and after buying this piece of land he moved to Portland, and since he had been to Boston, or New York, he didn't know where.

Q.   Did he show you the corner bound of this lot of the shoemaker, who moved to Portland or Boston?   A.   Only that rock.

Q.   What did he show you about that rock?   A.   He told me that was the corner bound, and went round the rock and showed me a mark on the rock.

### Testimony of Mrs. Deborah Sumner.

Q. Do you recall going down to Thomas Wasgatt's with Alvin Walsh and Mary Jane Chase? A. I do.

Q. What is your recollection of the time—the date? A. Well, I think it was 1867 or 1869, somewhere along there; I don't really fix the date.

Q. Who did you see there? A. I saw Mr. Thomas Wasgatt.

Q. Did you hear a conversation between Thomas Wasgatt and Alvin Walsh with reference to the payment of taxes? A. I did.

Q. What was this conversation? State what the conversation was? A. Well, Mr. Walsh spoke about the place, paying the taxes, that he would see his father about paying the taxes, but they could have the place, the use of the place for the paying of the taxes.

Q. What did Mr. Wasgatt say? A. He said he would pay the taxes for the use of the place.

Q. What place did they refer to? A. The Walsh place.

Q. What place was that? A. It was a place enclosed after Thomas Wasgatt had enclosed it in the field.

The instrument under which the predecessors of the defendant down to 1881 claimed to be occupying, includes in express description, all of said lot 69, including the one acre in question.

The deed in 1881 from Cornelius Wasgatt to the defendant, Mr. Wheelwright, includes in its description, the twenty-five acres, taking in also the one acre in question.

All of these conveyances prior to that to Wheelwright, conveyed a perfect title to the whole of lot 69, except the acre demanded, and the deed to Wheelwright conveyed the whole of the tract therein described, except the acre demanded.

Upon the point relative to the occupation of a part of the Pung, or Wasgatt farm, (other than the one acre in question), under deeds describing the entire lot, and the occupation of a part of the twenty-five acre Wheelwright lot, (other than the one acre in question), under deed describing the entire lot, the court, subject to seasonable exception on the part of the defendant, instructed the jury as follows:

"Well, it is necessary, of course, for this defendant to show that

he or those under whom he claims, and most, of course, of this occupation was by persons under whom he claimed prior to the time of the deed to him in 1881, he must show that he or they occupied this particular lot, this acre. It would not be sufficient for Mr. Bartlett, James Bartlett, upon his part, or Cornelius Wasgatt upon his part,—and by him, I mean, of course, those occupying under him,—it would not be sufficient that they occupied all the rest of this lot 69 for twenty years, or for fifty years, or for every year from 1844 up to to-day; because they had a right to occupy that during these various periods of time. The parties who owned during that time were the owners of the lot 69, all except the acre, and their occupation, the occupation of Bartlett and of the Wasgatts and persons under the Wasgatts, and of Freeman and Curtis, and of Wheelwright, of the rest of the farm, would not give them title to the lot demanded in this suit. And you see very readily why. Because they owned that. It is unquestioned and it is admitted that these various deeds conveyed all of lot 69, except the acre; and there was no reason why that Bartlett in his day, and the Wasgatts in Cornelius Wasgatt's time, and the others since, should not occupy the rest of it; because they owned it, and they did occupy it, and it is not questioned in this case.

"But the occupation of the rest of the farm, of the rest of lot 69 in this case, because of the fact that the deed conveyed to them a good and perfect and indefeasible title to the rest of the lot, would not give this defendant or any of his predecessors in title, title to that acre. The occupation must be of that acre, because it is the acre alone that is demanded; it is the acre alone that we are considering. Although, of course, it was necessary in appreciating the case and understanding the history of it, and the connection of these various parties with it, that we should know who was living upon the farm during the time, and who was occupying the whole lot at different times, and how they occupied the rest of the time, connected with it and admissible so far as it throws any light upon the occupation of the acre. But the important thing is the occupation of the lot in dispute. Now I think I must have made that plain to you.

"Sometimes when a person has a conveyance of a lot of land or a tract of land which is put upon record, and he occupies only a part of the described premises, his occupation of a part will be presumed to be of the whole because of the fact that he has a deed of the whole which is upon record, and it shows the nature and extent and character, and especially the extent, of his occupation; but that is not true when the deed actually conveys, because the grantor had the right and power to convey, a portion of the premises described in the deed. In other words, Mrs. Pung in the first place, and Bartlett afterwards, and Wasgatt still later, actually owning all of 69, at any rate except the lot, the deeds covering the whole of 69, and occupation of a part of 69 under the deeds, would not give title, however long continued, to the lot demanded in this writ, because those various persons, grantees in the deed, had a right to occupy, and did occupy under their deed, and the presumption, of course, is that a person's occupation is in accordance with his right."

*L. B. Deasy*, for plaintiffs.

Counsel cited: 3 Wash. Real Prop. p. 18; *Baxter* v. *Bradbury*, 20 Maine, 260-264, 37 Am. Dec. 49; *Stephenson* v. *Doe*, 8 Blackf. (Ind.) 508, 46 Am. Dec. 489-493; 1 Greenl. Ev. § 109; *Peaceable* v. *Watson*, 4 Taunt. 16; *Marcy* v. *Stone*, 8 Cush. 4, 54 Am. Dec. 736; *Currier* v. *Gale*, 14 Gray, 504, 77 Am. Dec. 343; *Noyes* v. *Dyer*, 25 Maine, 468; 3 Wash. Real Prop. *498; *Bailey* v. *Carlton*, 12 N. H. 9, 37 Am. Dec. 190; *Turner* v. *Stephenson*, (Mich.) 2 L. R. A. 277; *Trimble* v. *Smith*, 4 Bibb, Ky. 257; *Waggoner* v. *Hastings*, 5 Pa. St. 300; *Hole* v. *Rittenhouse*, 25 Pa. St. 491; *Beaupland* v. *McKeen*, 28 Pa. St. 124, 70 Am. Dec. 115; *Ament* v. *Wolf*, 33 Pa. St. 333; *Ewing* v. *Alcorn*, 40 Pa. St. 492; *O'Hara* v. *Richardson*, 46 Pa. 385; *MacArthur* v. *Kitchen*, 77 Pa. St. 62; *Thompson* v. *Burhaus*, 61 N. Y. 52; *Tritt* v. *Roberts*, 64 Ga. 156; *Bowen* v. *Chase*, 98 U. S. 262; *Proprs. Kennebec Purchase* v. *Laboree*, 2 Maine, 275, 11 Am. Dec. 79; *Putnam Free School* v. *Fisher*, 34 Maine, 172; *Adams* v. *Clapp*, 87 Maine, 316.

*H. E. Hamlin*, for defendant.

Counsel cited: Page on Wills, pp. 352-356; *Chamber's Admr.* v. *Wright's Heirs*, 40 Mo. 482, 93 Am. Dec. 311; *Hathorn* v. *Eaton*,

70 Maine, 219; *Richards* v. *Pierce*, 44 Mich. 444; *Poole* v. *Fleeger*, 11 Pet. 185; *Abbott* v. *Pratt*, 16 Vt. 626; *Gilmer* v. *Poindexter*, 10 How. 257; *Fenn* v. *Holme*, 21 How. 481; *Singleton* v. *Touchard*, 1 Black, 342; *Johnson* v. *Christian*, 128 U. S. 374; *Redfield* v. *Parks*, 132 U. S. 239; *Haynes* v. *Boardman*, 119 Mass. 414, 20 Am. Rep. 331; *Alden* v. *Gilmore*, 13 Maine, 178; *Pejepscot Proprs.* v. *Nichols*, 8 Maine, 362, 23 Am. Dec. 521; *Papernick* v. *Bridgewater*, 5 El. & Bl. 166, 85 E. C. L. 166; *Poole* v. *Morris*, 29 Ga. 374, 74 Am. Dec. 68; *Tyler* v. *O. C. R. Co.* 157 Mass. 336; *Hill* v. *Roderick*, 4 W. & S. 221; *Com.* v. *Kreager*, 78 Pa. St. 477; *Gordon* v. *Ritenour*, 87 Mo. 54, 56 Am. Rep. 440; *Mooring* v. *McBride*, 62 Tex. 309; *Hanley* v. *Erskine*, 19 Ill. 265; *Campan* v. *Dubois*, 39 Mich. 274; *Douglas* v. *Irvine*, 126 Pa. St. 643; *Morton* v. *Massie*, 3 Mo. 482; *Little* v. *Megquier*, 2 Maine, 176; *Proprs. Ken. Purchase* v. *Laboree*, 2 Maine, 275, 11 Am. Dec. 79; *Putnam Free School* v. *Fisher*, 34 Maine, 172; *Gardner* v. *Gooch*, 48 Maine, 487; *Marshall* v. *Walker*, 93 Maine, 532; *Noyes* v. *Dyer*, 25 Maine, 468; *Brackett* v. *Persons Unknown*, 53 Maine, 228.

SITTING: EMERY, WHITEHOUSE, STROUT, FOGLER, PEABODY, JJ.

EMERY, J. This was a real action for the recovery of a small parcel of land of about an acre in extent. One Harriet Pung, the owner of an hundred acre lot, conveyed out of it this one acre to Edward Walsh by deed recorded in 1842. Later, in 1845, Harriet Pung conveyed the whole hundred acre lot to James Bartlett. This deed included the one acre previously conveyed to Walsh, and under this deed the defendant claimed the one acre which the plaintiffs, the heirs of Edward Walsh, demand in this action. The verdict was for the plaintiffs and the defendant brings the case to the law court on these exceptions to the ruling of the presiding justice.

I. The plaintiffs claim title as children and heirs of Edward Walsh deceased who was seized in his life time. One of the plaintiffs, an heir of Edward Walsh, testified that Edward Walsh left a will, but could not say whether it had ever been probated in this state. There was no other evidence as to the will and none at all as to its contents or terms.

The presiding justice ruled that the testimony as to the will did not bar or affect the right of the plaintiffs as heirs to maintain this action.

When it is reflected that there is no evidence whatever that the will, even if probated, in any way disposed of or referred to this demanded acre, it must be manifest that the evidence did not in the least tend to show want of title in the plaintiffs as heirs.

II.   To defeat the plaintiff's seisin, the defendant undertook to establish by evidence an adverse possession of the demanded acre by himself and his predecessors in title for the requisite twenty years. To make out part of the twenty years he adduced the possession of one of his predecessors in title, Cornelius Wasgatt, from 1851 to 1867.   Cornelius Wasgatt, after the conveyance to him of the hundred acre lot including the demanded one acre, put his brother, Thomas Wasgatt now deceased, in possession under a verbal contract to convey the whole lot to him when he should pay him the cost of the lot.   Thomas did pay for the whole lot before his death but never took a deed from Cornelius.   The only actual possession Cornelius ever had of any part of the hundred acre lot was this possession by his brother, and verbal vendee, Thomas.   The latter occupied the whole lot generally as a farm, the one acre demanded, which was on the seashore, being included in the pasture which was surrounded by a fence on three sides and bounded by the sea on the fourth side. There was no other occupation of the demanded one acre than as a part of the pasture.

As tending to show that the occupation of this one acre was not adverse to the record owner Edward Walsh, under whom the plaintiffs claim, they offered in evidence the testimony of witnesses to the following effect, viz:   1—that at one time during his occupancy of the farm Thomas Wasgatt was standing by a large rock described in the deed to Edward Walsh as the corner bound of his acre lot, and said to the witness "that that rock [meaning the rock at the corner of the acre lot] corresponded with the record of a deed to Mr. Walsh that he had seen;" 2—that at another time during his occupancy he was sitting on this same rock talking with another witness sitting on

the road side,—that when told by the witness that this land by the rock seemed more fertile and was inquired of why he did not cultivate it, he said, "I don't own this piece, nor never did. There is a piece of land laying here between here and the beach and that line of stakes out there which I don't own." That he further said the lot pointed out belonged to a shoemaker, and that the rock was the corner bound of the lot; 3—that at another time during his occupancy he said to one of the sons of Edward Walsh who was there looking after his father's interests that he would pay the taxes on this lot for the use of it. To this testimony the defendant objected on the ground that the declarations of Thomas, the tenant, could not prejudice the rights or interests of his landlord Cornelius, especially as they were not brought to the notice of the record owner and hence did not influence his action. The testimony however was admitted.

The issue was the character of the occupation of this one acre lot during Thomas Wasgatt's occupancy of the whole hundred acre farm under his brother. Was that occupancy adverse to the record owner? The burden was upon the defendant, and, to sustain it, he had put in testimony as to Thomas Wasgatt's acts of occupancy. Had Thomas Wasgatt been produced as a witness by the defendant to prove occupancy, it can hardly be doubted that upon cross-examination Thomas could have been lawfully inquired of as to the extent and character of his occupancy. Had Cornelius Wasgatt been the defendant, and produced Thomas as a witness to prove a similar ground of defense, he must have subjected him to cross-examination upon the character of his occupancy.

It is to be noted that Thomas Wasgatt was deceased, that he was the person in actual occupation, and that he had a direct pecuniary interest in the land under his contract for purchase, and hence that all the declarations testified to were directly against his pecuniary interest. It is also to be noted that the first two declarations were made at the corner of the acre lot while viewing it, and the third declaration was made to the agent of the record owner who was there inquiring about the taxes.

The declarations were certainly of some probative force as to the character of the possession or occupation of the land, and we think that

under the above combination of circumstances they were admissible in evidence upon that question. Thomas Wasgatt, the declarant, was the person occupying. The acts of occupation were his. The declarations were made while he was in occupation and were concerning his occupation. They were made in the course of his business of occupation. Again, he was not the mere agent or tenant of Cornelius Wasgatt, under whom the defendant claims. He was occupying under a contract for purchase, which he fulfilled. He was occupying for himself. The occupation would inure to his own pecuniary benefit rather than to that of Cornelius. The declarations when made were more against his own pecuniary interest than against that of Cornelius.

In *Williams* v. *Ensign,* 4 Conn. 456, one Cotton had been in the personal occupation of the land for fifteen years, but was deceased at the time of the trial. Each party claimed that Cotton's occupation was under him or his predecessor in title. Cotton's declarations while in occupation of the land, that he held under the defendant's predecessor in title, were held to be admissible evidence. In *Marcy* v. *Stone,* 8 Cush. 4, 54 Am. Dec. 736, the defendant set up title by the adverse possession of Mrs. Healey, one of his predecessors in title. Mrs. Healey's son was shown to have been in actual occupation of the land and to have deceased. His declarations on the land that he was occupying it under Mrs. Healey, his mother, were held admissible. In *Currier* v. *Gale,* 14 Gray, 504, 77 Am. Dec. 343, the defendant set up title by the adverse possession of Jacob R. Currier (not the plaintiff) his predecessor in title. One Webster was shown by the defendant to have been in occupation of the premises for some fifteen years. Webster was deceased at the time of the trial and his declarations during his occupancy, that he occupied under Jacob R. Currier, were held admissible evidence. In all these cases was cited with approval the case, *Peaceable* v. *Watson,* 4 Taunt. 16, where it was held that the declarations of a deceased occupant of land stating under whom he occupied as tenant were admissible. It is true these cases cited are not precisely in point in all particulars, but they fully sustain the principle that the declarations of a deceased occupant of land made while occupying, in the course of his occupation,

as to the character of his occupation and against his own pecuniary interest, are admissible evidence. We think the principle includes this case.

An answer to the defendant's contention that the declarations of a tenant in occupation as to the character or purpose of his occupation should not be received in evidence against his lessor, is suggested by the case *Mee* v. *Litherland*, 4 Ad. & El. 784, (31 E. C. L. 179). In that case the defendant claimed a leasehold interest. The plaintiff claimed the leasehold interest had terminated by the attornment of the tenants, and to prove this produced an admission of the tenants to that effect. It was held that the admission of the tenants was evidence against the defendant since his title depended on theirs, and if their title failed his must also fail. In the case at bar the title of Cornelius Wasgatt, the defendant's predecessor in title, depended on the occupation by Thomas Wasgatt. If that occupation was not adverse to the claimant by record, Cornelius acquired no title by such occupation. Declarations by Thomas Wasgatt deceased, made while in occupation against his interest as to the character of his occupation, would seem to be evidence against all persons claiming title under that occupation even though such persons had no notice of such declaration.

III. The recorded deeds under which the defendant claimed title included not only the demanded acre, but also a much larger tract within which the acre was situated and included. That the defendant and his predecessors in title had occupied that part of this tract, outside of the demanded acre, in the manner and for the time necessary to acquire title thereto by adverse possession, was conceded. The defendant contended that such occupation of the rest of the tract was constructively extended over the demanded acre, by the familiar rule that adverse occupation of part of a tract of land under a recorded deed presumably extends over the whole tract described in the deed as conveyed. The presiding justice overruled this contention and in effect instructed the jury that there must have been some adverse occupation of some part of the demanded acre itself to bring it within the rule above stated. To this ruling the defendant excepted.

The principle of the rule invoked by the defendant is, that when an owner of a parcel of land sees, or could see, any part of it in the adverse occupation of another person, he should assume such occupation to be under some claim of right and if that occupation be under a recorded deed to the occupant, the owner is bound to take notice that the claim of right extends over the whole parcel and that the occupation of part will affect the whole. When, however, the owner finds that no part of his land is being adversely occupied, he has no occasion to assume or investigate anything. Recorded conveyances between other persons, even of his land if not followed by an actual adverse occupation of some part of his land, do not affect him. He is not required to take any notice of such conveyances. He is not required to take any notice from the occupation of adjoining lands that his land is claimed. His title to his own land is not affected by the most complete occupation of the adjoining lands. It is only when some part of his land is being adversely occupied that he is put upon inquiry or is affected with notice of recorded conveyances between other persons. Buswell on Adverse Possession, § 256; *Bailey* v. *Carleton*, 12 N. H. 9, 37 Am. Dec. 190; *Turner* v. *Stephenson*, 72 Mich. 409, 2 L. R. A. 277; *Rite* v. *Tubbs*, 23 Cal. 431; *Hole* v. *Rittenhouse*, 25 Pa. St. 491; *Adams* v. *Clapp*, 87 Maine, 316.

It must be conceded that the language of the opinion of this court in *Noyes* v. *Dyer*, 25 Maine, 468, cited by the defendant, does, apparently at least, sustain his contention. There is in the report of that case, however, a suggestion of other evidence in addition to the occupancy of the adjoining land. The presiding justice instructed the jury that the occupation of the adjoining land, "with the other evidence in the case, if believed by the jury constituted a disseisin of the demandant to the extent of the bounds of the lot described in the deed." In the opinion is stated some little evidence of occupation of the demanded parcel though it had not been improved or enclosed. The decision of the court was, that upon all the evidence the jury might find the demandant to have been disseised of the demanded parcel though it had not been enclosed or improved. In the case at bar the ruling complained of was based upon the hypothesis, of which

there was some evidence, that there was no adverse occupation of any part of the plaintiffs' land. So based, we think the ruling was correct, and so far as the dictum or opinion in *Noyes* v. *Dyer*, 25 Maine, 468, conflicts with that ruling we do not find it sustained either by reason or authority, and hence it must be considered as overruled. It cannot be that the owner of land, no part of which is occupied adversely to him, loses his title to it because one stranger has included it in his deed to another stranger. Whether the hypothesis was the fact was a question for the jury.

The defendant urges that the bill of exceptions in this case does show evidence of adverse occupation of the plaintiffs' acre, in that it was within the defendant's pasture undistinguishable from the rest of the pasture, the whole pasture being enclosed by a fence and the sea. The presiding justice, however, did not rule that there was no evidence of adverse occupation of the plaintiffs' acre. He simply ruled that, unless the jury found there was some actual adverse occupation of some part of the plaintiffs' acre, they could not extend over it the occupation by the defendant of other land within the same deed to which the plaintiff was a stranger. This ruling was correct. There was no request for a ruling upon the effect of the evidence stated.

*Exceptions overruled.*